**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Case No. 21-cr-217 (TFH)** |
|  | : |  |
| **v.** | : |  |
|  | : |  |
| **ANNIE HOWELL,** | : |  |
|  | : |  |
| **Defendant.** | : |  |
|  | : |  |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Annie Howell ("Howell") to 60 days imprisonment, one year of supervised release, $500 in restitution, and the mandatory $25 special assessment.

### I.    Introduction

The defendant, Annie Howell, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than one million dollars' of property damage.

When she learned that rioters were overrunning police barricades at the United States Capitol, Howell had already returned to her Washington, D.C. hotel room after attending the "Stop the Steal Rally" on January 6, 2021. Howell decided to leave her hotel and walked approximately

1

.7 miles to the besieged Capitol. Howell ultimately made her way to the Lower West Terrace ("LWT"), where she spent approximately an hour watching and documenting the siege at the tunnel entrance to the Capitol. In videos shared through social media on January 6, Howell can be heard cheering rioters and cursing police as police officers are attacked with stolen riot shields and other weapons.  Eventually, once the tear gas on the LWT became too much for Howell, she entered the Capitol through the broken window of Senate Terrace Mezzanine Room 2 ("Room ST-2M"), a sensitive conference room positioned directly next to LWT tunnel.  Howell then bragged on social media about making it inside the Capitol and uploaded a video where she can be heard attempting to lead a chant of "whose house, our house" in the ransacked conference room.

Howell pleaded guilty to one count of violating 18 U.S.C. §1752(a)(1): Entering and Remaining in a Restricted Building or Grounds.  As explained herein, a sentence of sixty days incarceration is appropriate in this case because Howell: (1) was preparing for violence prior to the attack, including discussing plans for bail, the acquisition of tear gas, and meeting with Proud Boys; (2) was aware of the potential for violence because, before she headed to the U.S. Capitol on January 6, she knew  rioters had breached defensive perimeters established by police at the U.S. Capitol;  (3) witnessed violence between other rioters and law enforcement officers before entering the U.S. Capitol, including the siege at the Lower West Terrace ("LWT") tunnel entrance, where she recorded several videos of the pitched battle between rioters and police there, and shared them on social media websites on January 6; (4) climbed through a broken window to enter the Capitol, and sent messages and video to others from inside the Capitol; (5) made statements on social media during and after the riot that displayed a lack of remorse, including falsely blaming the law enforcement officers for the violence on January 6; and (6) likely destroyed evidence as indicated by missing social media posts and the fact that she reset her mobile device 20 days after the riot.

Howell knew at the time she entered the U.S. Capitol that the building was restricted, that she did not have permission to enter the building, and her intent was to impede and disrupt the certification vote by Congress. The Court must also consider that Howell's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings. But for her actions alongside so many others, the riot likely would have failed to disrupt the Congressional certification vote of the 2020 Presidential election. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.")  Here, Castro's participation in a riot that actually succeeded in halting the Congressional certification combined with her celebration and endorsement of the violence and property destruction on that day, her claim of bravery, and her insinuation of future violence, renders a period of incarceration – rather than just probation or home detention – both necessary and appropriate in this case.

## II.    Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid repetition, the government refers generally to the general summary of the attack on the U.S. Capitol. *See* ECF 29 (Statement of Offense), at ¶¶ 1-7.  As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day.  However, the attempted breach and officer assaults that occurred at the LWT tunnel entrance to the Capitol Building, the location of perhaps the most violent confrontation on January 6, are deserving of further description as Howell spent approximately an hour viewing and recording those events.

3

### *Attempted Breach of the Capitol Building and Assaultive Conduct in Tunnel Leading to the doors of the West Front of the U.S. Capitol Building*

The fighting in the lower West Terrace tunnel was nothing short of brutal. Here, I observed approximately 30 police officers standing shoulder to shoulder, maybe four or five abreast, using the weight of their bodies to hold back the onslaught of violent attackers. Many of these officers were injured, bleeding, and fatigued, but they continued to hold the line. *Testimony of USCP Sgt. Gonell, MPD Officer Fanone, USCP Officer Dunn, and MPD Officer Hodges*: Hearing Before the House Select Comm. to Investigate the January 6th Attack on the United States Capitol, 117 Cong. (July 27, 2021) (Statement of Officer Michael Fanone) available at https://www.c-span.org/video/?513434-1/capitol-dc-police-testify-january-6-attack.

One of the most violent confrontations on January 6 occurred near an entrance to the Capitol Building in the area known as the Lower West Terrace ("LWT"). The entrance usually consists of a flight of stairs leading to a doorway. On January 6, 2021, however, the construction of the inaugural stage converted the stairway into a 10-foot-wide, slightly sloped, short tunnel that was approximately 15 feet long. That tunnel led to two sets of metal swinging doors inset with glass. On the other side of the two sets of swinging doors is a security screening area with metal detectors and an x-ray scanner and belt, that leads into the basement of the Capitol Building. The exterior of the tunnel is framed by a stone archway that is a visual focal point at the center of the West Front of the Capitol Building. This archway is also of great symbolic significance as it has been the backdrop for nine presidential inaugurations, is draped in bunting during the event, and is the entrance for the President-Elect and other dignitaries on Inauguration Day. Exhibit 1; "Inauguration at the U.S. Capitol", Architect of the Capitol, https://www.aoc.gov/what-we-do/programs-ceremonies/inauguration.



**Exhibit 1**

On January 6, 2021, when rioters arrived at the doors behind this archway, the outer set of doors was closed and locked, and members of Congress who had fled from the rioters were sheltering nearby.  Members of the United States Capitol Police ("USCP"), assisted by officers from the District of Columbia Metropolitan Police Department (MPD), were arrayed inside the doorway and guarding the entrance.  Many of these officers had already physically engaged with the mob for over an hour, having reestablished a defense line here after retreating from an earlier protracted skirmish on the West Plaza below.

At approximately 2:42 PM, the mob broke the windows to the first set of doors, and the law enforcement officers reacted immediately by spraying Oleoresin Capsicum ("OC") spray at the rioters, who continued to resist.  The mob continued to grow, and the rioters pushed their way into the second set of doors, physically engaging law enforcement with batons, poles, chemical

spray, bottles and other items. Officers created a line in the doorway to block the rioters and physically engaged them with batons and OC spray. At a later hearing on the events of January 6, Congressman Stephanie Murphy described her experience nearby this location in response to testimony from MPD Officer Daniel Hodges, who was assaulted while caught in the tunnel doors between the two forces:

> January 6th was an attack on our democracy, it was an attack on the peaceful transfer of power, and it was an attack on this Capitol building, but it was also an attack on real people. And most people don't know this -- and I don't think even you know this -- but your actions had a profound impact on me. So, at 3:00 p.m. on January 6th, 2021, while you were holding back the mob at the Lower West Terrace entrance, I was holed up with Congresswoman Kathleen Rice in a small office about 40 paces from the tunnel that you all were in. That's about from the distance where I'm sitting here on the dais to that back wall. And from that office in close proximity to where you all held the line, I listened to you struggle. I listened to you yelling out to one another. I listened to you care for one another, directing people back to the makeshift eyewash station that was at the end of our hall. And then, I listened to people coughing, having difficulty breathing, but I watched you and heard you all get back into the fight." Testimony of USCP Sgt. Gonell, MPD Officer Fanone, USCP Officer Dunn, and MPD Officer Hodges: Hearing Before the House Select Comm. to Investigate the January 6th Attack on the United States Capitol, 117 Cong. (July 27, 2021) (Statement of Rep. Stephanie Murphy) available at   https://www.c-span.org/video/?513434-1/capitol-dc-police-testify-january-6-attack.

The violent and physical battle for control over the LWT entrance in the tunnel and doorway area continued for over two hours, during which time rioters repeatedly assaulted, threatened, pushed, and beat law enforcement officers. The battle for the LWT entrance involved intense hand-to-hand combat, and some of the most violent acts against law enforcement, including the abduction and tasering of MPD Officer Michael Fanone and the previously-mentioned assault of Officer Daniel Hodges.

During this battle, the vastly outnumbered officers were assaulted with all manner of objects and weapons, receiving blow after blow from rioters taking turns assaulting them, all in a concerted effort to breach the doorway to the basement area of the Capitol, disrupt the certification,

and overturn the election results by force.  Capitol Police Sgt. Aquilino Gonell, who was present in the tunnel that day, explained:

> What we were subjected to that day was like something from a medieval battle. We fought hand-to-hand, inch-by-inch to prevent an invasion of the Capitol by a violent mob intent on subverting our democratic process. My fellow officers and I were committed to not letting any rioters breach the Capitol. It was a prolonged and desperate struggle.  *Id.* (Statement of Sgt. Aquilino Gonell)

Despite the mob's efforts, the officers in the LWT held the line with commendable restraint, and through personal sacrifice and valor.   MPD Officer Michael Fanone remembers one of his colleagues' actions that day:

> In the midst of that intense and chaotic scene, [MPD] Commander [Ramey] Kyle remained cool, calm, and collected as he gave commands to his officers. "Hold the line," he shouted over the roar. Of course, that day, the line was the seat of our American government. Despite the confusion and stress of the situation, observing Ramey's leadership, protecting a place I cared so much about, was the most inspirational moment of my life. The bravery he and others showed that day are the best examples of duty, honor, and service.  *Id.* (Statement of Officer Michael Fanone)

Several officers sustained injuries during this prolonged struggle, and many returned to defend the Capitol, even when injured, as substantial reinforcements for these officers did not arrive until heavily armored Virginia State Police officers joined the police line with additional munitions around 5 pm.

Despite being under constant assault, these officers nevertheless provided first aid to injured rioters who were trapped in the tunnel area, including those who had difficulty breathing as a result of chemical irritants that had been used in the tunnel area.  It is not an exaggeration to state the actions of these officers in thwarting the mob at the LWT entrance potentially saved the lives of others, including potential harm to members of Congress.

The Department of Justice publicly released a three-hour video from a camera inside the LWT tunnel ("Tunnel Video") that captures the assault from one vantage point.[1]

*Annie Howell's Role in the January 6, 2021 Attack on the Capitol*

On January 4, 2021, Annie Howell traveled with a small group to Washington, D.C., from her home in Pennsylvania to attend the "Stop the Steal" rally. *See* ECF 29 at ¶ 8. As reflected in Facebook Messenger conversations with the other individuals she was traveling with to D.C., this group planned for violent conflicts during the trip, particularly with ANTIFA, and discussed plans for bail, the acquisition of tear gas, and meeting with Proud Boys. *Id*. at ¶ 9. According to information Facebook provided to the government in response to a search warrant, on January 3, 2021, Howell asked whether others in the group had a plan for bail, stated she planned on writing phone numbers on her arm in sharpie because they would not have their cell phones in jail, and stated that she had received a shipment of pepper spray bottles.

After attending the former President's rally on the morning of January 6, 2021, Howell returned to her hotel, which was located approximately half of a mile from the Capitol building. However, Howell left the hotel after learning that a crowd had formed at the U.S. Capitol that was attempting to breach defensive perimeters established by police and enter the Capitol. *Id*. at ¶ 11.

Howell has claimed that by the time she entered the Capitol grounds the external law enforcement perimeters on the Western lawn had already been breached. However, Howell acknowledged she walked through clouds of tear gas and smoke as she approached the LWT tunnel to the Capitol Building. *Id*. at ¶ 13. In her voluntary interview with FBI agents conducted on October 13, 2021, in anticipation of a plea agreement, Howell described the scene as she

---

[1] The full video entitled "Three Hours of U.S. Capitol Surveillance Video at the Tunnel from Jan. 6, 2021" is available at https://www.youtube.com/watch?v=_a3RGlu5yLs.

approached the Capitol as violent, and specifically noted the large gallows that had been constructed on the Capitol grounds. Nevertheless, she continued onwards towards the LWT, where she spent approximately one hour watching the brawl at the tunnel.

Howell recorded at least five videos, which were uploaded to Facebook or shared with other individuals on or about January 6, that captured the battle for the LWT tunnel.   At approximately 3:55 p.m., Howell recorded as the crowd cheered two rioters who climbed above the crowd to hit and kick at law enforcement officers positioned beneath them.  *See* Ex. 2.  A still image from the video is included below as Exhibit 2-1.  Additionally, the assault was captured from the vantage point of law enforcement in the Tunnel Video at 1:54:30-1:55-30.



Exhibit 2-1

Howell then recorded as another rioter hung from the top of the tunnel and kicked down at police.   Later in the video, a second rioter using a stolen police shield and stick repeatedly attacked the police line.  *See* Ex. 3; *see also* Tunnel Video at 1:56:30-1:57:30.  The recording captured what sounds like Howell screaming "yeah" as the rioter kicked at police.   A still image from this recording is included as Exhibit 3-1.



Exhibit 3-1

Howell next recorded as rioters brought up a long step ladder in an attempt to breach the police line. *See* Ex. 4; *see also* Tunnel Video at 2:07:30-2:08:30. The ladder was ultimately

abandoned by the rioters before it reached the police line. A still image from the recording is
included as Exhibit 4-1.



Exhibit 4-1

Later, Howell recorded as rioters assaulted police with sticks, hurled objects, and even a
crutch. *See* Ex 5; *see also* Tunnel Video at 2:26:00-2:28:30. A still image from the recording is

included as Exhibit 5-1. As can be seen in the Tunnel Video, at approximately 4:26 p.m., shortly before Howell starts recording, three officers are being pulled by the rioters and dragged down the stairs. The rioters involved are being prosecuted for the assault in *United States v. SABOL et al.*, 21-cr-35 (EGS). These assaults are described in detail in the Statement of Facts attached to the respective Complaints, including one officer being held down and struck repeatedly about the head and body, while another officer was caught in a literal tug of war as other officers attempted to pull him from the rioters. *See Id.*, ECF 1. Howell's recording captured what sounds like Howell screaming "fuck you" at the officers during this attack.



Exhibit 5-1

Howell also participated in chants outside the LWT, such as "whose house, our house," supporting attempts to breach the Capitol. *See* Ex. 6; ECF 29 at ¶ 12.  In the video, you can see a door that appears to have been removed from Room ST-2M, and you can see tear gas streaming from the opening of LWT tunnel.  A still image from Howell's video is included as Exhibit 6-1.



Exhibit 6-1

After an hour of watching these scenes of violence described above, Howell entered the Capitol Building through a broken window next to the tunnel where officers were being assaulted

in the LWT tunnel.[2]  That window led to Room ST-2M, a conference room on the Senate side of the U.S. Capitol Building.  Room ST-2M is used by staffers to assist the functioning of the U.S. Senate, and is considered a sensitive space not open to the public.  According to records provided by Facebook in response to a search warrant, at approximately 4:53 p.m. Howell sent a Facebook Messenger message to a group stating, "I'm inside capital (sic)."  When HOWELL was instructed by a member of this group to exit the Capitol building immediately, HOWELL responded "No… No…  They just killlex (sic) two fucking women… American women… No… I WATCHED THEM DIE… NO FUCKING WAY." *See* ECF 29 at ¶ 15. HOWELL also sent a video depicting the inside of the Capitol building to the same group via Facebook messenger at approximately 4:56 p.m. In the video, Howell can be heard leading a chant of "whose house, our house" as she walks around a conference room.  *See* Ex. 7.  A still image from Howell's video is included as Exhibit 7-1.

---

[2] A publicly available video entitled "D.C. Burning – Jan. 6th Riots" ("D.C. Burning Video") shows a rioter breaking the window to the immediate left of the LWT tunnel at 12:56-13:20.  The videographer subsequently climbed through the window, and the video shows how Howell would have had to climb up to reach a broken, semi-circle window in order to enter the rooms next to the LWT tunnel.   *Id*. at 15:35-16:30.  The full D.C. Burning Video is available at https://www.youtube.com/watch?v=C4sIl5URW5Q.



Exhibit 7-1

In the October 13, 2021 interview with law enforcement, Howell stated that one of the interior doors of the conference room was locked, preventing her from going further into the Capitol.  Howell also explained that she exited through the same window she entered after noticing that other rioters had blocked up air vents and gaps in the doorway.

Upon exiting the Capitol Building, Howell stayed on Capitol grounds to watch as police officers attempted to reassert control over the building and grounds.  For example, Howell recorded a video depicting police forming a line next to scaffolding on the Northwest stairs while

a crowd of rioters yelled "traitors."  *See* Ex. 8.  The recording also captured what sounds like

Howell joining the crowd in chanting "Nazis" at the officers.  A still image from Howell's video

is included as Exhibit 8-1.



Exhibit 8-1

Immediately following the events described above, Howell expressed no remorse over her

involvement in the riot or the assaults of police officers she witnessed.  To the contrary, Howell

made a number of social media posts that appeared to blame police or otherwise distributed

propaganda regarding the riot.  In particular, Howell made the following two posts on or about

January 6, 2021, claiming that ANTIFA was somehow responsible for the riot, and blaming police

for the riot:

- The news is lying to you. Some of these people, were antifa. I watched a woman get shot and another's head was beaten. One died the other is in ICU. I was personally tear gassed 8 times. I was hit in the head with metal rods. People were shot at with rubber bullets. We were gassed 5 times in the matter of 2 minutes and thousands fell to their feet and we couldn't see or breathe. They wouldn't stop and beat us relentlessly.

- A police officer shot an unarmed woman today, who was a Trump supporter and KILLED HER. I have countless photos of bloody patriots, including myself. They shot us, hit us with sticks, tear gassed us, shot us with rubber bullets and knocked us to our feet! We couldn't breathe or see for over 10 minutes. They fired shots, grenades and tear gas and mase back to back to back, relentlessly. Women and children! Who were sitting there!!!! IMAGE [sic] IF THEY DID THIS TO BLM. ANTIFA LEADER IS THE ONE WHO BROKE INTO THE CAPITAL.

See ECF 29 at ¶ 16.

While Howell did not acknowledge her responsibility for the riot, she may have realized she was still legally culpable. The government's investigation revealed that someone deleted evidence of Howell's participation in the riot at the Capitol from her Facebook account. Although Howell has admitted to posting the above messages, which were captured in screenshots, the FBI was unable to locate these posts in the materials actually provided by Facebook in response to a search warrant. Additionally, Howell recorded videos of the events of January 6, 2021, including the seven videos provided to this Court as exhibits; however, investigators did not find these videos on her mobile device.

Information Facebook provided to the government in response to a search warrant stated that Howell conducted a factory reset of her cell phone on January 26, 2021. According to information provided by Facebook, while resetting her phone Howell sent a message to a relative saying that she "stopped the iCloud backup," and, in response, was told to "stay off the clouds, they are how they are screwing with us."

In her October 13, 2021 interview, Howell stated that she did not intentionally destroy any evidence. Howell opined that the missing social media posts could have been lost because

Facebook had temporarily suspended her account sometime before the events of January 6, but that she did not know what happened to the posts.  Additionally, Howell stated she performed a factory reset of the device because it was not working correctly.

<em>The Charges and Plea Agreement</em>

On March 2, 2021, Howell was charged by complaint with violating 18 U.S.C. § 1512(c)(2); 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. § 5104(e)(2).  On March 8, 2021, she was arrested in Pennsylvania.  On March 12, 2021, Howell was charged by five count indictment with violating 18 U.S.C. § 1512(c)(2); 18 U.S.C. §§ 1752(a)(1) and (2); and 40 U.S.C. §§ 5104(e)(2)(D) and (G).  On December 2, 2021, she pleaded guilty to Count Two of the Indictment, charging her with a violation of 18 U.S.C. § 1752(a)(1): Entering or Remaining in a Restricted Building or Grounds.  By plea agreement, Howell agreed to pay $500 in restitution to the Department of the Treasury.

### III.   Statutory Penalties

Howell now faces sentencing for Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1).  As noted by the plea agreement and the U.S. Probation Office, Howell faces up to one year of imprisonment, a fine of up to $100,000, and a term of supervised release of not more than one year. Howell must also pay restitution under the terms of the plea agreement.  *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).  By plea agreement, the parties have agreed that the riot caused approximately $1.5 million of damage to the United States Capitol and Howell agreed to pay restitution in the amount of $500. That restitution should be paid to the Architect of the Capitol as indicated in the Presentence Investigation Report ("PSR"). PSR at ¶ 102.

## IV.     The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).  "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49.  The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing.  *Id.* at 49.

The government agrees with the Sentencing Guidelines calculation set forth in the PSR. According to the PSR, the U.S. Probation Office calculated Howell's adjusted offense level under the Sentencing Guidelines as follows:

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2B2.3(a)) | 4 |
| Specific Offense Characteristics (U.S.S.G. §2B2.3(b)(1)(A)) | 2 |
| Acceptance of Responsibility (USSG §3E1.1(a)) | -2 |
| Total Adjusted Offense Level | 4 |

*See* PSR at ¶¶ 36-44.[3]

The U.S. Probation Office calculated Howell's criminal history as a category I, which is not disputed.  PSR at ¶ 48.  Accordingly, the Guidelines imprisonment range is 0-6 months. PSR at ¶¶ 44, 83.  Howell's plea agreement contains an agreed-upon Guidelines calculation that mirrors the U.S. Probation Office's calculation.

---

[3] The PSR incorrectly applies this specific offense characteristic because the trespass occurred "at a secure government facility" under U.S.S.G. §2B2.3(b)(1)(A)(i). PSR ¶ at 37. As indicated in the defendants' plea agreements, the specific offense characteristic applies because the trespass occurred "at any restricted building or grounds" under U.S.S.G. §2B2.3(b)(1)(A)(vii). ECF No. 35 at 3. On January 6, 2021, the U.S. Capitol was restricted because protectees of the United States Secret Service were visiting. *See* 18 U.S.C. § 1752(c)(1)(B). Because a two-level increase applies under either theory, there is no difference to the final offense level.

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *See Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108. Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101. As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing Commission's in-depth research into prior sentences, presentence investigations, probation and parole office statistics, and other data. U.S.S.G. §1A1.1, intro, comment 3. More importantly, the Guidelines reflect Congress's determination of potential punishments, as set forth in statutes, and Congress's on-going approval of Guidelines sentencing, through oversight of the Guidelines revision process. See 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to the Guidelines). Because the Guidelines reflect the collected wisdom of various institutions, they deserve careful consideration in each case. Because they have been produced at Congress's direction, they cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005). "[W]here judge and Commission *both* determine that the Guidelines sentences is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement)," and that *significantly* increases the likelihood that the sentence is a reasonable one." *Rita*, 551 U.S. at 347 (emphasis in original). In other words, "the Commission's recommendation

of a sentencing range will 'reflect a rough approximation of sentences that might achieve §
3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance all of the § 3553 factors to fashion a just and appropriate
sentence, the Guidelines unquestionably provide the most helpful benchmark.  As this Court
knows, the government has charged a considerable number of persons with crimes based on the
January 6 riot.  This includes hundreds of felonies and misdemeanors that will be subjected to
Guidelines analysis.  In order to reflect Congress's will—the same Congress that served as a
backdrop to this criminal incursion—the Guidelines will be a powerful driver of consistency and
fairness moving forward.

## V.    Sentencing Factors Under 18 U.S.C. § 3553(a)

The Court should next consider all of the applicable factors set forth in 18 U.S.C. § 3553(a).
*Gall*, 552 U.S. at 49-50. Under § 3553(a), "[t]he court shall impose a sentence sufficient, but not
greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a).  Some
of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and
characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the
offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford
adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities
among defendants with similar records who have been found guilty of similar conduct.
§ 3553(a)(6).  In this case, as described below, the Section 3553(a) factors weigh in favor of
incarceration.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021, is a criminal offense unparalleled in
American history.  It represented a grave threat to our democratic norms; indeed, it was the one of

the only times in our history when the building was literally occupied by hostile participants.  By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, this Court should note that each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances.  Here, Howell has admitted to that she walked through clouds of tear gas as she approached the Capitol Building and witnessed other rioters clashing with law enforcement as the rioters attempted to breach the LWT tunnel entrance.  *See* ECF 29 at ¶ 13. As depicted in Exhibits 2-5, Howell spent an hour watching and recording as police fought to keep rioters from entering the LWT tunnel before she ever entered the Capitol Building.  Howell knew she was breaking the law when she climbed through that window. While no one who participated in the January 6 riot can plausibly claim to have been a tourist, Howell is certainly not among the least culpable of the rioters.

Indeed, this Court should assess Howell's individual conduct on a spectrum of the unlawful conduct of other rioters that day.  This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated sincere remorse or contrition.  While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

To be clear, had Howell personally engaged in violence or destruction, she would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on Howell's part is therefore not a mitigating factor in misdemeanor cases, nor does it meaningfully distinguish Howell from most other misdemeanor defendants.

Moreover, unlike many of the misdemeanor cases, Howell was prepared for violence and possible arrest before she traveled to Washington, D.C. Prior to travelling, she communicated with a group of like-minded individuals and discussed planning for bail, the acquisition of tear gas, and meeting with members of the Proud Boys. The Government acknowledges that these conversations do not appear to be part of a specific plan to storm a government building or attack police. However, these facts are important as they demonstrate that Howell was not going to D.C. merely to attend a rally. And, when Howell descended on the Capitol on January 6, she knew it would be violent because she did not leave her hotel until she learned that a crowd of rioters were attacking police lines.

Additionally, Howell's presence on the grounds and subsequent entry into the Capitol Building raise significant concerns. As Howell approached the Capitol's grounds, she saw smoke and walked though clouds of tear gas and other eye irritants. Howell saw, by her own description, a violent scene, as she approached the Capitol. She then spent an hour or more watching the pitched battle between rioters and law enforcement officers in the LWT tunnel, and saw that officers were attempting to keep the rioters from entering the Capitol. And, when she finally entered the Capitol, she had to climb up through a broken window into a ransacked room replete with overturned furniture. Howell knew that she did not have permission to enter the Capitol, but did so anyway.

Howell is one of a smaller group of rioters who spent significant time near the LWT tunnel, which was never successfully breached, but still managed to enter the Capitol. Howell watched,

cheered, and filmed what amounted to a continuous, hours-long assault on police, and yet still thought it was appropriate to enter the Capitol. Put differently, the heroic efforts of the officers in the LWT tunnel on January 6 was the clearest possible directive to the rioters that they did not have permission to enter the Capitol. Howell intentionally disregarded that directive.

Howell's incendiary language and complete lack of remorse on social media during and after the attack are also aggravating factors. After Howell bragged to a Facebook Messenger group that she was inside the Capitol, she was advised by another member to leave right away. In response, Howell wrote "No… No…  They just killlex (sic) two fucking women… American women… No… I WATCHED THEM DIE… NO FUCKING WAY."  Howell then posted propaganda on social media, and accused the media of creating a false narrative, law enforcement of attacking innocent women and children, and ANTIFA of being responsible for the riot.

 Finally, Howell likely destroyed evidence after the riot.  The government was unable to locate two particularly damning social media posts in the materials turned over by Facebook in response to a search warrant.  Additionally, the government was unable to locate Exhibits 2-8 on the mobile device Howell used to record the videos.  Although Howell has denied intentionally destroying evidence, the government respectfully suggests that the mysterious disappearance of social media posts and the timing of the mobile device reset suggest otherwise.

Accordingly, the nature and the circumstances of Howell's offense establish the clear need for a sentence of incarceration in this matter.

### B.  Howell's History and Characteristics

As set forth in the PSR, Annie Howell is a 31-year-old woman who was born in Pennsylvania and lived there most of her life.  PSR at ¶ 54.  She obtained a General Education Degree (GED) in 2007 and attended Lucerne County Community College from 2007 through

2010.  PSR at ¶ 67.  Howell currently owns and operates a graphic design company and works part-time as an Uber driver.  PSR at ¶ 72.  There are no convictions on Howell's criminal record and her only charge prior to January 6, 2021, was a simple assault charge that was dismissed.  PSR at ¶ 50.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law.

The attack on the U.S. Capitol was an attack on the rule of law.  "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[4]  As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot.  *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this

---

[4] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf.

defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.  Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration.  For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.  As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70.  Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demands deterrence.  This was not a protest.  *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss).  And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences.  There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Howell's conduct on January 6, 2021, and social media posts during and after the riot demonstrate the need for specific deterrence for this defendant.  It is bad enough that she entered the Capitol despite watching, filming, and cheering on an hours-long assault of law enforcement officers in the LWT tunnel.  It is bad enough that she entered the Capitol after walking through clouds of tear gas and having purportedly been directly sprayed by law enforcement officers.  But, following her entry into the Capitol, she displayed pride in what she and other rioters had done. She bragged about being inside the Capitol and uploaded videos from inside the Capitol.  When a person in her social media group urged her to leave her response was "NO FUCKING WAY." Even after leaving the U.S. Capitol building, she demonstrated no recognition of wrongdoing.  At the bottom of the Capitol steps Howell took another video of rioters confronting law enforcement officers, this time calling the officers "traitors" and "nazis."   Howell then publicly asserted on Facebook that the media was lying, downplayed violence by rioters that day, compared it to Black Lives Matters protests, blamed the riot on ANTIFA, and blamed the police for violence during the riot.  These claims were flatly untrue, as Howell well knows.  It was not until Howell sought a plea agreement that she finally accepted responsibility and expressed remorse for her conduct.

The government acknowledges that Howell has accepted responsibility early by entering into this plea agreement.  However, Howell's propaganda during and immediately following the riot had the potential to spread harm further than her actions alone, and, when considered in contrast to the brutal attacks on dozens of police officers she actually witnessed, warrants specific deterrence in this case.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on law enforcement officers, to conspiracy to corruptly interfere with Congress.[5]  Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind.  Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment.  The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes. A probationary sentence should not become the default.[6] *See United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19 ("I don't want to create the impression that probation is the automatic outcome here because it's not going to be.") (statement of Judge Lamberth); *see also United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 (similar).

After a review of the applicable Section 3553(a) factors, the government believes that Howell should be sentenced to sixty days of incarceration, well within the Guidelines range, for her role in the Capitol riot.

---

[5] Attached to this sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.

[6] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC), *United States v. Douglas K. Wangler*, 1:21-cr-00365(DLF), and *United States v. Bruce J. Harrison*, 1:21-cr-00365(DLF). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

Although hundreds of individuals participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long she remained inside, the nature of any statements she made (on social media or otherwise), and whether she destroyed evidence of her participation in the breach, help explain the differing recommendations and sentences.   Avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement.  *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

While no previously sentenced case contains the exact same balance of aggravating and mitigating factors present here, the case of Mariposa Castro provides a substantially similar fact pattern.  *See United States v. Castro*, No. 1:21-cr-00299 (RBW) (Castro pleaded guilty 40 U.S.C. § 5104(e)(2)(G) on November 21, 2021).  Neither Castro nor Howell had a criminal record. *Id.*, ECF 40 (Government's sentencing memorandum).  Neither defendant travelled directly to the Capitol from the "Stop the Steal" rally, but instead left their hotel rooms only after they learned that the Capitol was under attack.  Neither defendant participated in violence, but both spent significant time on the LWT watching and filming the violent attacks on police officers.[7]  And, after watching those violent attacks on police officers, both defendants entered Room ST-2M in the Capitol Building by climbing up through a smashed-out window.  During and immediately

---

[7] As set forth in the attached table, defendants who, like Howell, cheered on rioters battling police, videotaped that violence, and shared those videos on social media have frequently received sentences involving jail time. *See*, *e.g.*, *United States v. Scavo*, 1:21-CR-00254 (RCL), ECF 48 (60 days incarceration); *United States v. Peterson*, 1:21-CR-00309 (ABJ), ECF 35 (30 days incarceration); *United States v. Courtright*, 1:21-CR-00072 (CRC), ECF 31 (30 days incarceration); *United States v. Simon*, 1:21-CR-00067 (ABJ), ECF 38 (35 days incarceration).

following the riot, both defendants glorified the rioters on social media, and neither defendant showed any remorse for their misconduct on January 6 until it was time to accept a plea deal.  Of note, unlike Howell, there does not appear to be any indication that Castro prepared for any acts of violence prior to January 6, nor that Castro may have destroyed evidence.  At a sentencing hearing conducted on February 23, 2022, Judge Reggie B. Walton sentenced Castro to 45 days in jail, noting the extended time the defendant spent on the LWT, the apparent glee with which she observed the attack on the Capitol, and the need to deter others from engaging in similar conduct following future elections.

The Court may also consider the sentence of Jennifer Ryan, who pleaded guilty to 40 U.S.C. § 5104(e)(2)(G).   *See United States v. Ryan*, No. 1:21-cr-00050 (CRC), Tr. 10/4/2021. Like Howell, Ryan learned of the unrest at the Capitol while inside her hotel room and ventured out to "storm the Capitol."  *Id.* at 42.   Like Howell, Ryan spent relatively little time inside the Capitol Building.  *Id.* at 41.   Judge Christopher R. Cooper sentenced Ryan to two months' jail time. In particular, Judge Cooper found significant that, when Ryan left her hotel room, she "knew that this was no ordinary peaceful protest."  *Id.* at 42.  He explained,

> [Y]ou knew it when you got to the Capitol when the riot was still going on.  You passed by a broken window.  You heard the alarms going off, and you smelled tear gas; so I don't think you could have missed the fact that this was no peaceful protest and that there was violence going on around you.

*Id.* at 43 (statement of Judge Cooper).

Karl Dresch also pleaded guilty to 40 U.S.C. § 5104(e)(2)(G).  *See United States v. Dresch*, No. 1:21-cr-00071 (ABJ), Tr. 8/4/21.  Like Howell, Dresch entered the Capitol Building and then relied on Facebook to express satisfaction and enthusiasm regarding the events of January 6, 2021, gloating that "we the people took back our house and those traitors know who's really in charge." *Id.* at 13.  Dresch, too, expressed an awareness of the officers' use of tear gas to repel the rioters.

Of course, there are differences between the rioters.  Unlike Howell, Dresch has an extensive criminal history.  *Id*. at 21-23 & 31-32.  However, Dresch does not appear to have witnessed, or cheered on, the violence against police like Howell.  *Id.* at 28 (statement of Judge Berman Jackson noting that Dresch "was peaceful, he was respectful; he didn't break anything, he didn't hurt anyone"). The government sought, and Judge Amy Berman Jackson imposed, a sentence of 6 months' imprisonment (which already had been served).  *Id.* at 23, 26.

The Court may also wish to consider the case of Rau and Jancart, who were co-defendants. *See United States v. Rau*, No. 1:21-cr-00467(JEB), Tr. 9/29/21; *United States v. Jancart*, No. 1:21-cr-00148(JEB), Tr. 9/29/21.  Both individuals pleaded guilty before Judge James E. Boasberg to 40 U.S.C. § 5104(e)(2)(D), Disorderly Conduct in the Capitol Building.  Like Howell, Rau and Jancart left their hotel and traveled to the Capitol only after learning that it had been "breached." Rau Tr. at 3.  They were not simply "following the crowd," which Judge Boasberg found "very significant."  Jancart Tr. at 23 (statement of Judge Boasberg).  Additionally, like Howell, the co-defendants appeared to be ecstatic about being involved in the riot, and were recorded shouting, "we made it up to the Capitol … we have the police surrounded!  We have you surrounded!" *United States v. Rau*, No. 1:21-cr-00467(JEB), ECF 13 at 3-4. Like Howell, Rau may have intentionally destroyed evidence, as Rau deleted texts from his phone that the FBI recovered through other means.  *Id.* at 9. There also are some differences between the rioters. Rau and Jancart appear to have been in the Capitol Building for approximately 40 minutes, longer than Howell. However, Rau and Jancart entered the Capitol through a door, rather than a hollowed-out window, and there is no indication that they observed prolonged violence like Howell.  *Id.* at 2. Both Rau and Jancart were sentenced to 45 days of imprisonment.  *United States v. Jancart*, No. 1:21-cr-00148-JEB, ECF  33; *United States v. Rau*, No. 1:21-cr-00467(JEB), ECF 21.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## VI.     Conclusion

For all of the reasons set forth above, the government recommends that a sentence of 60 days incarceration, at the lower end of the agreed-upon Guidelines range, one year of supervised release, $500 restitution, and the mandatory $25 special assessment, would be "sufficient but not greater than necessary" to accomplish the goals of 18 U.S.C. § 3553(a)(3).

Respectfully submitted,

MATTEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar Number 481052

By:     /s/ *Benjamin Kringer*
Benjamin E. Kringer
Detailed to the U.S. Attorney's Office
for the District of Columbia
D.C. Bar No. 482852
555 Fourth Street, N.W.
Washington, DC  20530
benjamin.kringer2@usdoj.gov
(202) 598-0687